UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WILLIAM MACNALLY,                         Case No. 07-CV-4432 (PJS/JJG)

                    Plaintiff,

v.                                        MEMORANDUM OPINION
                                              AND ORDER
LIFE INSURANCE COMPANY OF
NORTH AMERICA, a Pennsylvania
corporation, d/b/a CIGNA Group Insurance,

                    Defendant.


Denise Y. Tataryn, MANSFIELD TANICK & COHEN, PA, for plaintiff.

Scott R. Carlson, HINSHAW & CULBERTSON LLP, for defendant.

Plaintiff William MacNally worked for Allina in various executive positions. He served

as the CEO of several Allina hospitals, and later headed up Allina's human-resources and

information-systems divisions. MacNally was covered under life-insurance and long-term

disability insurance policies issued to Allina by defendant Life Insurance Company of North

America ("LINA").[1]  LINA also administered the policies. The life-insurance policy included a

waiver-of-premium benefit under which, if MacNally became disabled, the life insurance would

remain in force, and MacNally would no longer have to pay the premiums.

_____

[1]Some of the documents in the administrative record refer to LINA as "Cigna."  For
simplicity's sake, the Court consistently refers to defendant as "LINA."

The administrative record is Exhibit A to the Carlson Affidavit and was filed with
LINA's memorandum in support of its summary-judgment motion [Docket No. 63].  Pages in
the administrative record are denoted herein by the prefix "AR" followed by the page-number
portion of a page's Bates number (e.g., page LINA 0040 is denoted as AR 40).

MacNally was diagnosed with multiple sclerosis ("MS") in 1993. He continued to work at Allina for several years, but in 2002, after his symptoms became increasingly severe, he stopped working and sought long-term disability benefits and the waiver-of-premium benefit. After twice denying MacNally long-term disability benefits and twice reversing those denials, LINA eventually granted MacNally long-term disability benefits, which he continues to receive. LINA also granted MacNally the waiver-of-premium benefit for about four years, but LINA terminated that benefit in 2006.

MacNally now sues for the waiver-of-premium benefit under 29 U.S.C. § 1132(a)(1)(b), the section of the Employee Retirement Income Security Act ("ERISA") that authorizes suits for benefits. LINA and MacNally cross-move for summary judgment. For the reasons that follow, the Court grants MacNally's motion and denies LINA's.

## I. BACKGROUND

### A. Policy Terms

Under the life-insurance policy at issue in this case, if an employee such as MacNally becomes "Disabled" for purposes of the policy and remains disabled for nine months (the "Benefit Waiting Period"), LINA will waive the employee's life-insurance premiums. AR 32, 39-40. As long as the employee remains disabled and cooperates with LINA in establishing the fact of his disability, the life insurance will remain in force, and the premiums will be waived, until the employee reaches the age of sixty-five. AR 32, 40.[2]

---

[2]The life-insurance policy actually includes two different provisions about the duration of the life-insurance benefits and the waiver-of-premium benefit. One provision, under the heading "Waiver of Premium," says that life-insurance benefits will end on the earliest of four dates: (1) when the employee "is no longer Disabled"; (2) when the employee "no longer qualifies for Waiver of Premium"; (3) "[t]he day after the period for which premiums are paid"; or (4) when

(continued...)

The life-insurance policy defines "Disability" in two ways. AR 57. The first definition, which applies during the first twelve months that an employee is disabled, covers what is known as "own-occupation" disability. The second definition, which applies after an employee has been disabled for twelve months, covers what is known as "any-occupation" disability.

Own-occupation disability is defined this way:

> An Employee will be considered Disabled if, because of Injury or Sickness, he or she is unable to perform the material and substantial duties of his or her occupation.

*Id.* Any-occupation disability is defined this way:

> After 12 months of disability, the Employee will continue to be considered Disabled only if he or she is unable to perform the material and substantial duties of any occupation for which he or she is, or may reasonably become, qualified . . . based on education, training and experience.

---

[2](...continued)
"the Maximum Benefit Period" ends (in this case, when the employee turns sixty-five). AR 39, 32.

A second provision, under the heading "Termination of Waiver," says that life-insurance benefits will end "for any Employee whose premiums are waived" on the earliest of these four dates: (1) when the employee "is no longer Disabled"; (2) when the employee "refuses to submit to any physical examination required by" LINA; (3) "[t]he last day of the 12 month period of Disability during which he or she fails to submit satisfactory proof of continued Disability"; or (4) when "the Maximum Benefit Period" ends. AR 40.

Although the policy does not explain how these two provisions are related, the first seems to apply when LINA *actually* decides that an employee does not qualify for the waiver-of-premium benefit. The second seems to allow LINA to *constructively* decide, based on an employee's failure to provide certain evidence, that an employee does not qualify for the waiver-of-premium benefit.

In particular, the second provision covers an employee who has already received the waiver-of-premium benefit for over twelve months. Such employees receive a subsequent waiver-of-premium benefit "for future periods of 12 months," and proof of disability is not required until "3 months *before* the end of the 12 month period." AR 40 (emphasis added). The "Termination of Waiver" provision allows LINA to cut off the waiver-of-premium benefit at the end of a 12-month period for which it was automatically extended even if the employee remains disabled, provided that the employee fails to submit *proof* that he remains disabled.

*Id.*

For most workers, the any-occupation definition of disability will be more difficult to meet than the own-occupation definition. If an employee cannot do his *own* occupation for twelve months, he is considered disabled and is entitled to the waiver-of-premium benefit, even if he can do a different occupation — that is, even if he is capable of gainful employment.[3] But an employee is not considered disabled — and is therefore not entitled to the waiver-of-premium benefit — after that twelve-month period unless he cannot do *any* occupation "for which he . . . is, or may reasonably become, qualified . . . based on education, training and experience." *Id.*

The long-term disability insurance policy under which MacNally is receiving benefits defines disability differently from the life-insurance policy. Although MacNally is obviously not challenging LINA's (ultimately favorable) decision on his long-term disability claim, LINA's decision on the waiver-of-premium claim was intertwined with its decision on MacNally's long-term disability claim. Thus, to understand the context of MacNally's claim for the waiver-of-premium benefit, it is important to consider the terms of his long-term disability insurance policy.

Like the life-insurance policy, the long-term disability policy includes two definitions of disability, an own-occupation definition and an any-occupation definition. Unlike the life-insurance policy, however, the long-term disability policy defines disability not just in terms of what *jobs* an employee can *do*, but also in terms of what *wages* an employee can *earn*. That is,

---

[3]Because of the nine-month waiting period, an employee who is disabled from his own occupation for twelve months will receive the waiver-of-premium benefit under the own-occupation definition of disability for only three months.

the long-term disability policy (unlike the life-insurance policy) includes a so-called wage threshold in its definition of disability.

Under the long-term disability policy, own-occupation disability is defined this way:

> An Employee is Disabled if, because of Injury or Sickness, . . . he or she is unable to perform all the material duties of his or her regular occupation, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings[.]

AR 412. Any-occupation disability is defined this way:

> An Employee is Disabled if, because of Injury or Sickness, . . . after Disability Benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings.

*Id.*

If an insured such as MacNally becomes "Disabled" for purposes of the long-term disability policy, LINA must pay the insured a "Disability Benefit." AR 413-14. Because MacNally made over $280,000 annually when he stopped working for Allina, he receives the policy's maximum benefit of $12,000 per month, less other benefits received by him (such as Social Security Disability Insurance ("SSDI") benefits), and less a portion of his post-disability earnings (if there are such earnings). AR 413-14, 420, 456.

*B.  Facts*

1.  Claim-Processing History

MacNally applied for long-term disability benefits in July 2002.  He indicated on his application that his multiple sclerosis had become disabling.  AR 1116.  A few months later, in September 2002, MacNally inquired about the waiver-of-premium benefit.  AR 1068.  There is no evidence in the record that LINA responded to this inquiry.

Throughout October 2002, LINA asked MacNally for additional information about his long-term disability claim and reviewed the material he submitted.  The same month, LINA told MacNally that it would refer him to an outside contractor, Allsup, for assistance in seeking SSDI benefits.  AR 1035.  There is no evidence in the record that LINA followed up on this referral or that Allsup took any action on MacNally's claim at this time.

LINA denied MacNally's long-term disability claim on November 12, 2002.  AR 964-67.  LINA informed MacNally that "the medical information contained in your claim file does not support your inability to continue working at your occupational duties as of your last day of work."  AR 966.

MacNally immediately appealed.  AR 955.  Throughout December 2002 and January 2003, MacNally forwarded additional material to LINA to support his claim.  Some time in this period MacNally retained Mansfield, Tanick & Cohen, which continues to represent him in this case.  An attorney of the firm, Brian Dockendorf, wrote to LINA on January 22, 2003 to support MacNally's appeal.  AR 733-54.  Dockendorf enclosed eighteen exhibits, including medical records, letters from MacNally's doctors, letters from MacNally's colleagues at Allina, letters from MacNally and his wife, a form outlining the requirements of MacNally's job, and general information about multiple sclerosis.  AR 755-927.

LINA asked for additional records in February 2003, and in March 2003, LINA referred MacNally's claim to an outside neurologist for review. AR 672. The neurologist agreed with MacNally's doctors that the medical records established that MacNally was unable to do his job. AR 660-61. Accordingly, on April 15, 2003, LINA approved MacNally's claim for long-term disability benefits retroactively to July 3, 2002. AR 630-31.

The same day that LINA notified MacNally about its approval of his long-term disability claim, LINA contacted Allina for information about the waiver-of-premium benefit. AR 627. Also at about this time, MacNally asked LINA about the waiver-of-premium benefit and told LINA that he had not received any response to his September 2002 letter on the subject. AR 626.

LINA approved the waiver-of-premium benefit in early June 2003, or just under eleven months after MacNally filed his claim for disability benefits. AR 232. Apart from emails between LINA and Allina about the amount of MacNally's life-insurance coverage, there is no evidence in the record about LINA's decision process in the 2002–2003 period with respect to the waiver-of-premium claim.

In mid-June 2003, shortly after approving the waiver-of-premium claim, LINA contacted Allsup about assisting MacNally in applying for SSDI benefits. AR 601. Allsup apparently helped MacNally file an SSDI application, which was denied in August 2003. AR 591-96. Allsup helped MacNally appeal the denial, and in February 2004, MacNally's application for SSDI benefits was granted based on a disability-onset date of September 1, 2003. AR 580. The record does not, however, include a copy of the Social Security Administration's decision awarding MacNally benefits.

Over the next year, LINA continued to pay MacNally disability benefits and to waive the premiums on his life-insurance policy. LINA next contacted MacNally in May 2004 to inform him that the own-occupation period for disability benefits would be ending soon and to ask for additional information so that LINA could assess whether MacNally was entitled to benefits under the any-occupation definition of disability. AR 572-73. MacNally filed a new application for benefits in mid-June 2004, and in late July, LINA approved MacNally's claim for disability benefits. AR 563-71 (application), 562 (approval letter). As far as the Court can tell, the administrative record contains no evidence about LINA's review of MacNally's claim during this period.

A year later, in May or June 2005, LINA asked MacNally to provide a supplemental claim form with respect to his long-term disability claim. AR 561. MacNally did so. AR 556-60. There appears to be no evidence in the record about LINA's review of this form during 2005.

The next year, in July 2006 — four years after MacNally first applied for benefits — LINA asked MacNally for updated information with respect to his waiver-of-premium benefit "to ensure that [he] continue[d] to meet the definition of disability." AR 230. MacNally completed a new claim form and provided additional medical records, including a Physical Ability Assessment form (or "PAA") completed on July 25, 2006 by his neurologist at the time, Dr. Allen Ingenito. AR 530-39 (claim form); AR 544-45 (PAA). MacNally provided additional medical records in August 2006.

In September 2006, LINA prepared a "Transferable Skills Analysis" (or "TSA") based on the July 25, 2006 PAA of Ingenito. AR 211. According to the TSA, MacNally could do two

jobs — one of which was administrator of a health-care facility, MacNally's old job.[4]  AR 211.

LINA notified MacNally on September 8, 2006 that it was discontinuing his waiver-of-premium benefit because, based on the July 25, 2006 PAA, MacNally was capable of doing the two jobs identified in the TSA and therefore did not meet the any-occupation definition of disability found in the life-insurance policy.  AR 207-10.

LINA received additional medical records in September 2006, shortly after having cut off MacNally's waiver-of-premium benefit.  AR 202.  LINA reviewed the records and stood by its earlier decision.  AR 197.  Although LINA's decision related only to MacNally's waiver-of-premium benefit (the subject of LINA's inquiry in July 2006), LINA referred MacNally's file in mid-October to the long-term-disability group "for further medical investigation based [u]pon information from Waiver Team."  AR 457.

MacNally's counsel, Denise Tataryn, wrote to LINA on December 1, 2006 to appeal LINA's discontinuance of MacNally's waiver-of-premium benefit.  AR 161-95.  Tataryn included additional medical records from MacNally's various doctors, including a letter from Ingenito explaining the July 25, 2006 PAA.  AR 180.  LINA reviewed these materials and, on December 21, 2006, LINA affirmed its discontinuance of MacNally's waiver-of-premium benefit.  AR 141-42.  LINA relied largely on the opinion of an in-house doctor, Dr. John Mendez, who found MacNally not to be disabled because "although multiple subjective

_____

[4]According to the TSA, neither of these jobs provided sixty percent of MacNally's pre-disability salary.  AR 211, 212 ("I also explored with wage requirement and was unable to find a match."), 214.  This information would be relevant to the long-term disability policy (which had a wage threshold), but not to the life-insurance policy (which did not).  That said, the actual wage threshold in the long-term disability policy is eighty percent, not sixty percent.  AR 412.  It is a mystery why the LINA case manager who requested the TSA specified a wage threshold of sixty percent.  AR 214.

complaints are noted" in MacNally's medical records, "there is no documentation of significant measured physical limitations . . . and no documentation of cognitive and/or psychological limitations . . . ."  AR 448, 142.

Meanwhile, in February 2007, the LINA long-term-disability group asked for another TSA from LINA's vocational group.  The TSA referral form included a sixty-percent wage threshold, not the eighty-percent wage threshold found in the long-term disability policy.  AR 456 (TSA referral form), 412 (policy).  The TSA was prepared in late February and did not identify any jobs meeting the wage threshold.  AR 454-55.  Nonetheless, on April 3, 2007, LINA informed MacNally that it was discontinuing his long-term disability benefits as of the end of the month.  AR 438-42.  LINA's decision was based primarily on the September 2006 TSA, which (as noted above) identified two jobs MacNally could do, including his former job as a hospital administrator.  AR 211-12 (TSA), 441 (denial letter).

Tataryn appealed the discontinuance of MacNally's disability benefits on April 12, 2007.  AR 435-36.  The same day, Tataryn renewed her appeal of LINA's discontinuance of MacNally's waiver-of-premium benefit.  AR 119-36.  Tataryn forwarded additional medical records to LINA, including a neuropsychological evaluation of MacNally's cognitive abilities completed in April 2007.  AR 134-36.  According to that evaluation — which assessed *only* MacNally's cognitive abilities — MacNally had an MS-related "cognitive disorder," but the disorder "would [not] be expected to interfere with capacity to carry out daily activities and responsibilities."  AR 136.  LINA forwarded the evaluation to an outside psychologist, who agreed with the evaluation's conclusions.  AR 106-08.

LINA then conducted a TSA, in June 2007, based solely on the April 2007 neuropsychological evaluation and the claim form completed by MacNally on July 31, 2006.

The TSA, which did not include a wage threshold, identified five jobs that MacNally could ostensibly do. AR 239-40. On the basis of this TSA, LINA informed MacNally on June 14, 2007 that it was standing by its discontinuance of his waiver-of-premium benefit. AR 95-97. Tataryn protested the decision. AR 62-64.

Meanwhile, LINA upheld its discontinuance of MacNally's long-term disability benefits on May 30, 2007. AR 269. But on June 25, 2007 — shortly after LINA affirmed its discontinuance of MacNally's waiver-of-premium benefit — Tataryn renewed her objection to LINA's discontinuance of MacNally's long-term disability benefits. AR 249-68. A month later, LINA reversed course and reinstated those benefits. AR 236.

The administrative record contains no evidence about how LINA reached the decision to reinstate MacNally's long-term disability benefits. LINA informed Tataryn on June 26, 2007, that MacNally's appeal was being forwarded to the appeals team, and a month later, on July 24, 2007, LINA wrote to say that his long-term disability claim was approved. AR 242-43, 236. As far as the record shows, LINA did nothing between June 26 and July 24, and LINA's approval letter was silent about why LINA changed its mind.[5] AR 236.

MacNally brought this action seeking reinstatement of his waiver-of-premium benefit in October 2007.

2. MacNally's Personal and Medical History

MacNally worked at Allina or one of its predecessor companies since the mid-1980s. AR 951-52. In April or May 1993, he was diagnosed with MS. AR 852. Notwithstanding the

---

[5]The Court finds it difficult to believe that LINA reversed its decision with respect to MacNally's long-term disability benefits without creating so much as a memo to the file or an email on the subject, but, as far as the record reflects, that is what happened.

diagnosis, MacNally continued to work in high-level executive positions at Allina (as of 1997, MacNally was the CEO of Mercy Hospital). AR 833, 839.

Multiple sclerosis is

> a chronic, often disabling disease that attacks the central nervous system (CNS), which is made up of the brain, spinal cord, and optic nerves. Symptoms may be mild, such as numbness in the limbs, or severe, such as paralysis or loss of vision. The progress, severity, and specific symptoms of MS are unpredictable and vary from one person to another.

Nat'l Multiple Sclerosis Soc'y, "What Is Multiple Sclerosis?" http://www.nationalmssociety.org/about-multiple-sclerosis/what-is-ms/index.aspx (last visited May 15, 2009). MacNally has what is known as "relapsing-remitting MS," the most common form of the disease, in which "a person experiences attacks (also called relapses or exacerbations) of worsening neurologic functioning followed by periods of remission in which partial or complete recovery occurs." Nat'l Multiple Sclerosis Soc'y, "What We Know About Relapsing-Remitting MS (RRMS)," http://www.nationalmssociety.org/living-with-multiple-sclerosis/relapsing-ms/relapsing-remitting-ms-rrms/index.aspx (last visited May 15, 2009).

MacNally's initial symptoms were treated with Solu-Medrol, a type of steroid administered intravenously ("IV"), to which he responded well.[6] AR 809. An MRI taken in 1993 "showed numerous areas of probable central nervous system plaques." *Id.* But a repeat MRI a year later "was almost totally normal." AR 810.

---

[6]Solu-Medrol is a brand name of methylprednisolone, a steroid used to treat multiple sclerosis as well as to relieve other types of inflammation. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Methylprednisolone Sodium Succinate Injection," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited May 15, 2009).

When MacNally first returned to work in 1993 after the diagnosis of MS, he worked about four hours per day and needed a cane for distance walking or for standing for long periods of time.  AR 851.  MacNally has used a cane regularly ever since.  MacNally's primary-care doctor, Dr. Jerrol Noller, observed in May 1993, shortly after MacNally returned to work, that although MacNally was doing well, there was "[c]ertainly a lot of rearranging of career and family priorities probably ahead of him."  *Id.*  Also around this time, MacNally began regularly seeing a psychologist, Richard J. Fowler, Ph.D., for anxiety and depression occasioned by the MS diagnosis.  AR 978.

In February 1994, MacNally told Noller that he needed more sleep and was experiencing fatigue, weakness, numbness, and occasional sensations of electric shocks in his face, hands, and spine.  AR 849.  MacNally also reported needing "rest without sleep" for about a half an hour each afternoon as well as at least eight hours of sleep per night.  *Id.*

In April 1994, Noller found MacNally to be "very frustrated and upset, even moderately depressed," and prescribed Prozac.[7]  AR 848.  MacNally and Noller had a "[l]ong discussion . . . regarding [MacNally's] affect, behavioral adjustments that may now be necessary, seeking a sense of balance between work and home and play."  *Id.*  Within a month, MacNally had stopped taking Prozac because of side effects and because of his wife's objections.  AR 847.  At an office visit in mid-May 1994, MacNally told Noller that "any time he overdoes his activity . . . he has worsening of his symptoms including intention tremor and muscle rigidity," symptoms that Noller noted "he does demonstrate today."  *Id.*

---

[7]Prozac is a brand name of fluoxetine, a drug classified as a selective serotonin reuptake inhibitor or "SSRI" that is used to treat depression and certain other psychiatric disorders.  U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Fluoxetine," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html (last visited May 15, 2009).

Throughout 1994 and 1995, MacNally managed his MS in consultation with Noller and Fowler. Although his symptoms troubled him sometimes, it appears that they were fairly manageable, and (as noted above) a 1994 MRI was basically normal. AR 810.

In September 1995, MacNally stopped seeing Fowler (he resumed in 2000). Fowler wrote in his notes for that period: "Our work is concluded for now — more focused on health/work." AR 995. Also around this time, Noller observed at an office visit that MacNally's affect was normal, his body movements were "smooth and controlled," and he had "no obvious lateralizing neurologic defects." AR 842. During the same visit, however, Noller noted that MacNally reported increased fatigue and symptoms of gastro-esophageal reflux disease after having returned to work from a sabbatical the previous month. *Id.*

A few months later, in January 1996, MacNally told Noller that he was exhausted and sleeping poorly. AR 842. MacNally also expressed concern that his verbal and cognitive capacities might be decreasing. *Id.* Noller prescribed a low dose of Elavil,[8] a tricyclic antidepressant with some sedating effect, as well as Zoloft, a different, nonsedating type of antidepressant.[9] AR 843. Although the Elavil improved MacNally's sleep, which in turn improved MacNally's mental focus and cognitive functioning, MacNally did not like its side effects, and he soon stopped taking it. *Id.* He continued to take Zoloft, with some interruption, for at least a few months. AR 841.

_____

[8]Elavil is a brand name of amitriptyline, a tricyclic antidepressant. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Amitriptyline," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (last visited May 15, 2009).

[9]Zoloft is a brand name of sertraline, an SSRI. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Sertraline," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited May 15, 2009).

In April 1996, MacNally reported to Noller that his MS symptoms were worse, though not so bad that MacNally felt that he was having a full-blown exacerbation or "flare-up" of his MS.[10]  *Id.*  MacNally reported increased dysesthesias[11] as well as balance problems requiring the use of a walking stick or a wall for support when hiking or walking for exercise.  *Id.*

---

[10]According to the National Multiple Sclerosis Society:

> An exacerbation of MS (also known as a relapse, attack, or flare-up) causes new symptoms or the worsening of old symptoms. It can be very mild or severe enough to interfere with a person's ability to function at home and at work.  No two exacerbations are alike, and symptoms vary from person to person and from one exacerbation to another.  For example, the exacerbation might be an episode of optic neuritis (caused by inflammation of the optic nerve that impairs vision) or problems with balance or severe fatigue.  Some relapses produce only one symptom (related to inflammation in a single area of the central nervous system) while other relapses cause[] two or [more] symptoms at the same time (related to inflammation in more than one area of the central nervous system).
>
> To be a true exacerbation, the attack must last at least 24 hours and be separated from the previous attack by at least 30 days.  Most exacerbations last from a few days to several weeks or even months.

Nat'l Multiple Sclerosis Soc'y, "Exacerbations,"
http://www.nationalmssociety.org/about-multiple-sclerosis/treatments/exacerbations/index.aspx
(last visited May 15, 2009).

[11]A "dysesthesia" is an "unpleasant abnormal sensation"; it is a type of paresthesia.  Nat'l Inst. of Neurological Disorders & Stroke, U.S. Dep't of Health & Human Servs., "Restless Legs Syndrome Fact Sheet," http://www.ninds.nih.gov/disorders/restless_legs/detail_restless_legs.htm (last visited May 15, 2009).  "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body.  The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching."  Nat'l Inst. of Neurological Disorders & Stroke, U.S. Dep't of Health & Human Servs., "NINDS Paresthesia Information Page,"
http://www.ninds.nih.gov/disorders/paresthesia/ paresthesia.htm (last visited May 15, 2009). Paresthesias are a symptom of MS and other disorders of the central nervous system.  *Id.*

MacNally then began, in January 1997, regularly seeing a neurologist for management of his MS.[12]  At the time, MacNally was experiencing an MS flare-up; his symptoms included feelings of electric shock known as " Lhermitte's sign,"[13] weakness, fatigue, and unsteadiness.  AR 810-11.  The initial flare-up was treated with Solu-Medrol, and in February, MacNally's neurologist prescribed Trental[14] to treat his exhaustion and perhaps prevent progress of his MS.  AR 810.  A month later, in late March 1997, MacNally began administering weekly injections of Avonex to slow the progress of his MS.[15]  AR 804.  MacNally continued to take Avonex for the next five years, until switching in 2002 to Rebif, a similar drug.[16]  AR 778.

[12]Over the past ten-plus years, MacNally has been seen at the Minneapolis Clinic of Neurology by three different neurologists:  Charles W. Hall, Allen P. Ingenito, and Jacqueline T. Bernard.

[13]"Lhermitte's sign is a brief, stabbing, electric-shock-like sensation that runs from the back of the head down the spine, brought on by bending the neck forward."  Nat'l Multiple Sclerosis Soc'y, "Pain," http://www.nationalmssociety.org/about-multiple-sclerosis/symptoms/pain/index.aspx (last visited May 15, 2009).

[14]Trental is a brand name of pentoxifylline.  It "is used to improve blood flow in patients with circulation problems to reduce aching, cramping, and tiredness in the hands and feet.  It works by decreasing the thickness (viscosity) of blood.  This change allows your blood to flow more easily, especially in the small blood vessels of the hands and feet."  U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Pentoxifylline," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685027.html (last visited May 15, 2009).

[15]Avonex is a brand name of interferon beta-1a that is administered weekly by intramuscular injection and is used "to decrease the number of episodes of symptoms and slow the development of disability in patients with relapsing-remitting . . . multiple sclerosis . . . ." U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Interferon beta-1a Intramuscular Injection," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693040.html (last visited May 15, 2009).

[16]Rebif, like Avonex, is a brand name of interferon beta-1a.  But Rebif is administered three times a week by subcutaneous injection, rather than once a week by intramuscular injection.  U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Interferon beta-1a Subcutaneous Injection,"

(continued...)

- 16 -

MacNally's MS was fairly stable in late 1997 and early 1998. At a June 1998 visit, MacNally's neurologist described him as having "[v]ery mild multiple sclerosis." AR 807. But at that visit, MacNally complained that he was under stress, his Lhermitte's sign had returned, his legs were tingling more than in the past, he was tired much of the time, and he was not sleeping well. *Id.* The neurologist prescribed flurazepam,[17] a sedative, to treat MacNally's insomnia, along with pemoline,[18] a stimulant, to increase his alertness. AR 808. A month later, in July 1998, Noller also found that MacNally's MS was mildly exacerbated, with symptoms including Lhermitte's sign, muscle fatigue, hand tremors, mild muscle rigidity in his arms, and mild spasticity in his upper right leg.[19] AR 837-38.

Also around this time (mid-1998), MacNally changed positions at Allina. He left his position as a hospital CEO to become a vice president in charge of information systems. AR 837.

At a followup visit in December 1998 with his neurologist, MacNally continued to report balance difficulties, weakness, and some tingling and numbness. AR 804-05. MacNally also

---

[16](...continued)
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604005.html (last visited May 15, 2009).

[17]"Flurazepam is used to treat insomnia (difficulty falling asleep and staying asleep). Flurazepam is in a class of medications called benzodiazepines. It works by slowing activity in the brain to allow sleep." U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Flurazepam," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682051.html (last visited May 15, 2009).

[18]Pemoline is a stimulant sold under the brand name Cylert. Nat'l Insts. of Health, Nat'l Inst. of Mental Health, "Medications," http://www.nimh.nih.gov/health/publications/medications/complete-index.shtml (last visited May 15, 2009).

[19]MacNally's hand tremors apparently predate his MS but have been exacerbated by it. AR 802.

reported a decrease in his night vision.  AR 805.  MacNally reported that the pemoline increased

his energy but that he felt quite fatigued after 10 p.m. and continued to have insomnia.  AR 804.

A month later, in late January 1999, Noller again prescribed Elavil for MacNally's

depression and insomnia.  AR 836.  MacNally continued to complain of balance problems that

got worse in the evening, but also reported that his energy level had improved somewhat.

AR 802.  Two months later, at a visit with Noller in March 1999, MacNally reported that his

fatigue was improved, as was his ability to make decisions and tolerate work stresses.  AR 833-

34.  But Noller also described MacNally as suffering "moderate clinical depression" and

"profound sleeplessness" for which the Elavil was "somewhat effective."  AR 834.

MacNally's condition apparently worsened slightly in the next few months, and at a visit

in June 1999 to his neurologist, MacNally described cognitive difficulties that he felt had been

getting worse for two years.[20]  AR 800.  The neurologist described MacNally as suffering

"[m]ultiple sclerosis with fatigue and cognitive issues" and increased his dosage of pemoline.

AR 801.

A brain MRI in September 1999 was normal.  AR 798.  But MacNally's neurologist

noted a slight increase in MacNally's balance problems, a coarsening of his tremor, as well as

---

[20]The neurologist wrote in her notes:

> [MacNally] also notes that he has in particular difficulty with
> executive function with regard to his memory and this really
> manifests itself with difficulty doing multitasking.  This has been
> slowing progressive over the last two years.  In terms of mood, Bill
> does have some good days and some bad days.  He denies any
> change in his vision or any new numbness or tingling.

AR 800.

difficulties with so-called "tandem gait"— that is, heel-to-toe walking.[21]  *Id.*  The neurologist

increased MacNally's Elavil dose to help with sleeplessness.  *Id.* at 798-99.  At a subsequent

visit in December 1999, based on MacNally's complaints of side effects, MacNally's regular use

of pemoline was discontinued, though his prescription was continued for use on an as-needed

basis.  AR 796-77.  Neuropsychometric testing done around this time was basically normal.

AR 796.

      December 1999 and January 2000 were stressful periods at work for MacNally, and he

often worked fourteen-hour days.  AR 794.  He took pemoline occasionally in this period and, at

a visit in late January 2000, he told his neurologist that he was fatigued.  AR 794.  MacNally also

reported that his tremors worsened over the course of the day but that he did not feel that he was

experiencing an MS flare-up.  AR 794.  The neurologist discontinued MacNally's Trental

prescription to see if this improved his fatigue.  AR 795.

      MacNally's mood worsened during this period, and he began seeing his psychologist,

Fowler, again in July 2000.  AR 999-1000.  MacNally reported to Fowler that his MS had

worsened.  AR 1000.  In his notes, Fowler wrote (apparently quoting MacNally):  "Bill's work

stress is significantly having negative impact — 'giving up' to the disease is not OK — 'I need

to hold on.'"  AR 1000.

      Both Noller and MacNally's neurologist found, in September 2000, that MacNally's MS

was getting worse.  According to Noller, in early September, MacNally was experiencing

_____

     [21]"Tandem gait testing is another valuable tool used when assessing dizzy patients.
Stepping one foot in front of the other (in tandem manner) is easy to perform, yet it provides a
good assessment of general cerebellar function."  William J. McFeely, Jr. and Dennis I. Bojrab,
*Performing the Physical Examination:  Posture and Gait Tests*, in *Practical Management of the
Dizzy Patient* 109, 111 (Joel A. Goebel, ed., 2d ed. 2008).

increased muscle spasms, "occasional muscle tone collapse with minor falls," and increased tremors. AR 830-31. MacNally also reported to Noller that the day after his weekly injection of Avonex, MacNally suffered flu-like symptoms that exacerbated his MS symptoms. AR 830. In late September, MacNally's neurologist determined that MacNally was experiencing an MS flare-up and prescribed IV Solu-Medrol. AR 792-93. The neurologist noted that MacNally's energy was deteriorating more quickly over the day and that MacNally had increasing tremors, difficulty with tandem gait, problems sleeping, and "right internuclear ophthalmoplegia" — that is, difficulty moving his right eye.[22] *Id.*

Noller and MacNally's neurologist also both expressed concern in September 2000 about MacNally's ability to keep working. At a September 26, 2000 office visit, MacNally and his neurologist had a "lengthy talk about disability and options." AR 793. And Noller, in his notes about a September 6, 2000 office visit, expressed doubts about MacNally's ability to work, writing: "I feel that Bill is facing an imminent decrease in his workability [*sic*] and functionality and may be facing a disability situation. He seems determined to make a success of his new job, but I believe his disease will prevail." AR 830. And in October 2000, Fowler noted that "both [Noller] and I are strongly questioning the negative impact of job stress on Bill's M.S. condition." AR 997.

MacNally started a new position at Allina in late 2000, as vice president in charge of human resources. AR 790. This position was less stressful than his earlier job as head of information services. *Id.* By December 2000, MacNally was again using the stimulant pemoline

---

[22]Ophthalmoplegia is "[p]aralysis of one or more of the ocular muscles due to disorders of the eye muscles, neuromuscular junction, supporting soft tissue, tendons, or innervation to the muscles." Nat'l Inst. of Health, Genetics Home Reference — Glossary, "Ophthalmoplegia," http://ghr.nlm.nih.gov/glossary=ophthalmoplegia (last visited May 15, 2009).

daily, and he was experiencing "increasingly frequent paresthesias in the hands and feet" as well as hand tremors. AR 790. His neurologist prescribed Neurontin[23] for the paresthesias and observed that MacNally was "doing fine with the exception of paresthesias and fatigue." AR 791.

At his next visit to his neurologist, in March 2001, MacNally reported numbness and weakness in his hands that had caused him to drop things. AR 788. MacNally reported that the Neurontin did not help his numbness, and it was discontinued in favor of a trial of clorazepate.[24] *Id.* The neurologist also prescribed trazodone[25] in place of amitriptyline for MacNally's insomnia and started MacNally back on Zoloft. AR 789. Thus, as of this visit, MacNally was taking medicines to slow progression of his MS (Avonex) and to treat numbness (Neurontin, then clorazepate), insomnia (amitriptyline, then trazodone, plus over-the-counter sleep aids), tremors (Inderal),[26] fatigue (pemoline), and depression (Zoloft). AR 788-89. The neurologist

---

[23]Neurontin is a brand name of gabapentin, an anti-seizure medication that is also used to treat certain types of pain arising from nerve damage. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Gabapentin," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited May 15, 2009).

[24]"Clorazepate is used to relieve anxiety. It also is used to control agitation caused by alcohol withdrawal as well as seizures." U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Clorazepate," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682052.html (last visited May 15, 2009).

[25]"Trazodone is used to treat depression. Trazodone is in a class of medications called serotonin modulators. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Trazodone," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited May 15, 2009).

[26]Inderal is a brand name of propranolol, a medicine that relaxes blood vessels and is prescribed generally for high blood pressure, but also to prevent migraines and tremors. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Propranolol," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html (last visited May 15, 2009).

also scheduled an electromyogram ("EMG"), which was completed on March 30, 2001 and showed "mild loss of motor unit potentials in the arms." AR 787.

MacNally saw Noller in late March 2001. MacNally complained of ringing in his ears, insomnia, and depression. AR 827. In his notes about this visit, Noller wrote:

> [MacNally] has been experiencing marked stress from work-related politics for the past two to three years with no improvement in sight. He has been strongly urged by some work colleagues and supported by his physicians in the notion of going on disability. He just does not feel that is appropriate. He feels capable.

*Id.*

From January through July 2001, MacNally saw Fowler several times, and Fowler's assessment of MacNally's functioning continually decreased. AR 998, 1001-03. As of the period from April to June 2001, Fowler diagnosed MacNally as suffering from major depression. AR 1002. In his office notes from this period, Fowler wrote that MacNally "believes the progression of his MS is limiting his job opportunities . . . feeling rather trapped by the progression of the illness." AR 1003.

In mid-July 2001, MacNally experienced another MS flare-up. AR 785. He reported increasing tiredness over several weeks as well as stiff muscles and tingling in his hands toward the late afternoon. *Id.* MacNally's neurologist again treated the flare-up with a course of IV Solu-Medrol, followed by additional oral steroids. AR 786.

Some time in August or September 2001, after his flare-up was treated, MacNally went to France. *Id.* Upon his return, MacNally started taking methotrexate[27] to treat his MS, along

---

[27]Methotrexate is a type of medication called an "antimetabolite" and is generally used to treat severe psoriasis, some cancers, and severe rheumatoid arthritis. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Methotrexate," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html (last visited May 15, 2009).

(continued...)

with Avonex.  AR 786, 781.  MacNally reported to his neurologist that he got overheated and significantly fatigued on one day while in France but generally did well.  AR 783.  MacNally also told both Noller and his neurologist that upon his return, Allina informed him that he was being laid off because of his disability resulting from his multiple sclerosis.  *Id.,* AR 825. (Allina apparently did not follow through on this threat, as MacNally continued to work for the company until July 2002.)

This news was stressful for MacNally, and he reported experiencing increased numbness, sleeping difficulties, significant fatigue, and blurred vision.  AR 783, 825.  In notes about an office visit in September 2001, MacNally's neurologist, Dr. Jacqueline T. Bernard, wrote:  "The stress Bill is undergoing currently may have translated into physiologic stress and appears to be associated with another flare-up.  This is more frequent than Bill's usual flare-up rate."  AR 784. Bernard suggested that MacNally shorten his work week and rest as much as possible, and she and MacNally "talked at length about disability issues . . . ."  *Id.*  Fowler, in his office-visit notes for the period between July and September 2001, said that "[MacNally's] future at this or possibly any level of significant responsib[ility] will come [at] a significant cost to his mental/physical health."  AR 1005.

MacNally experienced another flare-up in October 2001 that was treated with IV steroids followed by oral steroids.  AR 781.  As of early November 2001, MacNally was still experiencing Lhermitte's sign and had marginal energy and occasional blurred vision.  *Id.*

---

[27](...continued)
"Methotrexate is also sometimes used to treat . . . multiple sclerosis . . . and other conditions that develop when the immune system is over-active."  *Id.*

Bernard decided to gradually discontinue Trental and to treat MacNally's fatigue with Provigil[28] rather than pemoline.  AR 782.  An MRI in November 2001 showed no changes since the MRI a year earlier.  AR 780.

MacNally's mood improved somewhat by December 2001, and he was able to focus and concentrate better than previously.  AR 824.  But MacNally told Noller that his work situation remained uncertain because of his MS.  *Id.*[29]

Throughout the early months of 2002, by all accounts, MacNally's mental and physical health deteriorated, and he frequently discussed disability issues with his health-care providers. For instance, Fowler's notes for the period of January to February 2002 indicate that MacNally's depression was getting worse.  AR 1008-09.  Fowler also noted, with respect to employment, that MacNally was "very concerned to be gainfully employed for economic security, but MDs [and] I see great price personally."  AR 1009.  Fowler's notes for the period of March to April 2002 say that MacNally's "sense of job functioning is seriously impaired" and MacNally "feels like his body is deteriorating to [the] point that his options are quite limiting."  AR 1011. According to Fowler, MacNally's Axis V Global Assessment of Functioning ("GAF") level at the time was 45 out of a possible 100.[30]  *Id.*

---

[28]Provigil is a brand name of modafinil, which "is in a class of medications called wakefulness promoting agents.  It works by changing the amounts of certain natural substances in the area of the brain that controls sleep and wakefulness."  U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Modafinil," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602016.html (last visited May 15, 2009).

[29]In his office-visit notes from December 19, 2001 Noller wrote:  "Apparently no decision will be made about [MacNally's] work future, his considerations of disability due to the multiple sclerosis that need to be addressed."  AR 824.

[30]The Axis V GAF scale, a part of the *Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition* (the DSM-IV), is a method of rating a person's "psychological,

(continued...)

MacNally's depression was related to an MS flare-up that he experienced in February 2002. AR 779-80. The flare-up was treated with IV steroids followed by oral steroids, but the treatment did not fully resolve his symptoms. AR 780, 821. Noller observed in his notes about a March 5, 2002 office visit:

> [MacNally] continues to be positive for depression which is basically related to both his work and MS. The two have become intertwined as he finds himself being considered more and more disabled. Dr. Bernard feels that stresses involved with his current corporation decidedly have had an effect of exacerbation of MS symptoms three times in the last ten months. The patient is very reluctant and, in fact, refuses to consider himself disabled.

AR 821.

The next month, in April 2002, MacNally fell down some stairs and had some visual problems that suggested that he might be having another MS flare-up. AR 819. Noller prescribed a course of oral steroids; it is not clear whether MacNally took them. *Id.*

Also some time in the spring of 2002, MacNally apparently interviewed for a job at a hospital in Wisconsin. AR 1013. But according to Fowler, although MacNally was excited about the job at first, he then became "very down about the energy he knows the job would require that he doesn't have." *Id.* MacNally reported being discouraged by the most recent steroid treatment for his MS, which had "little effect," apart from eliminating numbness in his feet. *Id.*

---

[30](...continued)
social, and occupational functioning on a hypothetical continuum of mental health–illness." Michael B. First et al., *DSM-IV-TR Guidebook* 73 (2004). A score from 41 to 50 indicates "[s]erious symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

Some time in May 2002, MacNally was "edged out to disabled status by the Allina Corporation," according to Noller's office-visit notes from late May 2002. AR 815. But MacNally apparently told Bernard at an office visit in early July 2002 that he was "finally going to quit working" and was under stress from "forced retirement." AR 777-78. At the same office visit, MacNally expressed concern that he was having another MS flare-up. AR 777. MacNally reported increased numbness and tremors, difficulty sleeping, and blurred vision. *Id.* Bernard noted that MacNally was experiencing "more frequent flare-ups and accumulating more deficits," and she switched him from Avonex to Rebif and increased his dosage of Neurontin. AR 778.

Fowler's notes from the period of July to August 2002 paint a slightly different picture of MacNally's job situation at this time, saying that MacNally "[h]as taken short-term medical leave — his position has been eliminated." AR 1014. MacNally remained depressed during this period and told Fowler that he anticipated having to move from a two-level house to a single-level house. AR 1015. MacNally reported being "less suicidal" but also being "very sad — and exhausted." *Id.* MacNally also told Fowler that he was dependent on his cane and was much weaker — so weak that when his wife (who had recently had surgery) fell down, MacNally was unable to help her. *Id.*

As noted above, MacNally applied for disability benefits in July 2002. In connection with that application, Bernard completed a PAA on July 29, 2002 on which she indicated that MacNally could not do any activities for any length of time during an eight-hour workday.[31]

_____

[31]Along its left margin, the PAA lists several activities, such as sitting, standing, walking, reaching, lifting, and carrying. AR 1130-31. Following each of those activities appears, on this particular PAA, a horizonal row of four check boxes. The first three check boxes are for

(continued...)

AR 1130-31.  And according to MacNally's ophthalmologist, Dr. Gunnar J. Erickson, an eye examination on July 31, 2002 showed that MacNally had "internuclear ophthalmoplegia which causes double vision when he looks to the side."  AR 766.

In mid-August 2002, MacNally again saw Bernard.  MacNally reported that Provigil helped his fatigue but was not as helpful as other medications he had used in the past.  AR 775. With respect to MacNally's other symptoms and medications, Bernard observed that MacNally's tremor was better since they increased his dose of Inderal, and that although Neurontin was helping his tingling, MacNally asked about increasing the dose.  *Id.*  MacNally reported ongoing insomnia, for which Bernard prescribed trazodone and increased his Neurontin.  AR 776.

Roughly a month later, on September 18, 2002, Bernard completed a second PAA. AR 1057-58.  On this PAA (in contrast to the earlier one), Bernard filled out the check boxes. She indicated that MacNally could sit frequently (i.e., 2.5 to 5.5 hours per day), could occasionally lift or carry under twenty pounds, and could occasionally stand, walk, climb, reach,

---

[31](...continued)
indicating whether, in an eight-hour workday, the person being assessed can do the particular activity (a) continuously (67–100% of the time), (b) frequently (34–66% of the time), or (c) occasionally (1–33% of the time).  The fourth check box allows the doctor to indicate that the activity is "not applicable" to the diagnosis.  (Other PAAs the Court has seen, including the PAA in this case completed on July 25, 2006 by Ingenito, have five check boxes:  one for "not applicable to diagnosis," three for how often the person being assessed can do the particular activity, and one for whether the assessment is "supported by objective findings."  AR 549.)

Perhaps because the PAA does not include a check box labeled "never" for the various listed activities, Bernard did not check any of the frequency-related boxes on the PAA.  Instead, with respect to sitting, standing, walking, and climbing, she wrote: "0% may not due to fatigue and ataxia."  AR 1131.  With respect to lifting and carrying, she wrote: "0% may not at all due to ataxia (poor balance)."  *Id.*  With respect to balancing, stooping, kneeling, crouching, crawling, seeing, reaching, grasping, and use of the hands for fine manipulation, she wrote: "0% may not due to ataxia, fatigue and cognitive impairment."  *Id.*, AR 1130.  With respect to working overtime or using foot controls, she wrote: "0% may not due to ataxia."  AR 1130.  And with respect to MacNally's ability to tolerate heat, cold, and other environmental conditions, she wrote: "heat aggravates MS."  *Id.*

grasp, or use his hands for fine manipulation.  *Id.*  In the column labeled "not applicable to diagnosis," she wrote "no" next to various activities to indicate that MacNally could not do them at all.[32]  In a space for notes, she wrote, "multiple sclerosis is a progressive neurological disorder."  AR 1058.

In connection with his disability claim, MacNally completed a questionnaire in September 2002.  AR 1072-77.  In response to a question asking what condition prevented him from working, MacNally wrote:  "MS fatigue, double vision, numbness tingling right arm and leg. [Losing] ability to concentrate."  AR 1072.  With respect to driving, MacNally said that he could drive except during an MS flare-up; he also commented that frequent numbness and tingling in his right arm occasionally interfered with his ability to drive.  *Id.*  With respect to sleeping, he said that he took "at least one if not 2 naps during the day."  *Id.*  As for his activities, he said that he did volunteer work on board committees and with a mediation service for two to four hours per week.  AR 1073.  He also said that he exercised two to four times a week for twenty to thirty minutes when not having an MS flare-up, and took half-mile walks three times a week on cool, dry days.  *Id.*  He also indicated that he walked with a cane.  AR 1072.  With the questionnaire, MacNally provided a list of the many medications he was then taking.[33]  AR 1077.

MacNally remained depressed in September and October 2002.  In his office-visit notes for this period, Fowler wrote:  "Job loss has triggered additional grieving with his loss of health

---

[32]Bernard indicated that MacNally could not:  lift or carry over 20 pounds; push or pull; balance, stoop, kneel, crouch, or crawl; be exposed to extreme heat, vibration, humid conditions, or fumes; work extended shifts or overtime; or use foot controls.  AR 1057-58.

[33]The list of drugs MacNally was regularly taking included: Rebif (for slowing progress of MS), Celexa (for depression), Provigil (for fatigue), Inderal (for tremors), Neurontin (for numbness and insomnia), Trazodone (for insomnia), Tylenol PM (for insomnia), and Prevacid (for gastro-esophageal reflux disease).  AR 1077.

— very down." AR 1016.  MacNally also reported to Fowler that he was unable to care for his

wife "without help from his son, Andrew — steps, lifting no longer [at] former capacity — quite

limited."  *Id.*

MacNally's insomnia improved somewhat by mid-October 2002 as a result of having

switched to trazodone.  AR 814.  But his MS symptoms included spastic muscle tone,

dysesthesias of the hands and feet, and mild bladder spasticity, but no visual disturbances.  *Id.*

MacNally reported to Noller that he was not exercising and was taking care of his wife, who had

recently had medical problems of her own.  *Id.*

In response to questions from LINA, Bernard wrote a letter on October 30, 2002

providing additional information about MacNally's condition.  AR 970.  Bernard explained, in

response to a question about what had changed for MacNally between February and July 2002,

that "the changes in [MacNally's] condition from February to July 2002 were due to

fatigue . . . ."  *Id.*  Bernard also said that MacNally's fatigue had worsened "because of chronic

insomnia thus aggravating all of his neurological symptoms."  *Id.*   Bernard pointed out that

MacNally had an MS flare-up in February 2002 that took "quite a[]while to resolve."  *Id.*

Bernard summed up:

> I would say that Mr. MacNally's course is very characteristic for
> relapsing remitting multiple sclerosis, and that his medication
> profile is also typical.  He has been very compliant with his
> medications and follow-up lab testing, etc., but it does fluctuate
> which is characteristic of multiple sclerosis.

*Id.*  And in response to a question about MacNally's exercise program, Bernard said that exercise

"has been beneficial in helping Mr. MacNally recover from his last flare-up."  *Id.*

MacNally saw Bernard on November 7, 2002 and reported increasing numbness in his

lower extremities.  AR 773.  MacNally also complained of double vision, but Bernard did not

see any internuclear ophthalmoplegia. *Id.* MacNally had hand tremors, a normal casual gait, and astasia abasia on tandem gait — that is, a gait disturbance without an underlying neurological or physical cause.[34] *Id.*

Bernard wrote to LINA again, in late November 2002, to support MacNally's claim for disability benefits. AR 771-72. Bernard said that MacNally suffered from fatigue, paresthesias, and ataxia, and that he could not work 60 to 70 hours per week. AR 771. In particular, Bernard emphasized that "the most difficult symptom" of MS is "severe fatigue." *Id.* She wrote:

> Although perhaps difficult to quantify or place into typical job
> requirement categories, fatigue is an overwhelming and very
> complicated symptom to manage and it is difficult to precisely
> account for potential disability in this situation. Typically, in all
> individuals with multiple sclerosis, fatigue is what, in the end,
> renders a daily work week impossible.

AR 771-72.

Noller, too, wrote to LINA in late 2002 to support MacNally's claim for benefits, saying that MacNally had "become unable to work intensively for more than a few hours."[35] AR 949. Noller wrote:

> I have felt for some time that Bill is not able to perform to the
> standards of his profession any longer. He has only recently
> agreed. I strongly support the designation of total disability for
> this patient.

---

[34]*See* Scott A. Marshall et al., *Conversion Disorders*, http://emedicine.medscape.com/ article/287464-overview (updated Dec. 22, 2008) ("Conversion disorder can imitate the entire spectrum of movement disorders and include tremor, chorea, myoclonus, dystonia, tics, parkinsonism, knee buckling, and a host of other bizarre gait disturbances. A commonly used term for a type of this last phenomenon is an astasia-abasia gait pattern, in which the patient makes wild movements of the trunk and arms during a gait evaluation but does not fall or err from a stressed gait such as a tandem or toe gait.").

[35]Noller's letter is undated, but it was included as an attachment to a letter to LINA from MacNally dated December 6, 2002. AR 943.

> Specifics of the physical disability would be best obtained from neurology consultants. It should be kept in mind that "rested" physical deficits are significant in this case, but the deficits are markedly worsened by a standard work day, increased stress, or by increased body temperature.

*Id.*

Also in December 2002, Fowler and Erickson both provided letters supporting MacNally's claim. According to Fowler, it was already clear in early 2002 that "fatigue was and is such a reality that even considering the demands of corporate leadership results in a debilitating reality." AR 950. Fowler said that MacNally could not work in any kind of executive position and could, at most, do "short-term consultation-type tasks guided by his self-determined periods of adequate strength and energy." *Id.* For his part, Erickson said that MacNally's eye problems were "disabling to the point that Mr. MacNally is unable to perform normal daily activities required of a Senior Executive Officer as defined by Allina's job description." AR 948.

In addition, MacNally supported his benefits claim in December 2002 with letters from his colleagues at Allina. David Jones, Allina's Chief Financial Officer, wrote: "[O]ver the period of time that I have known Bill, I have observed that Bill's medical condition has had a significant negative impact on his ability to meet the demands of an executive level position. . . . [H]e is not able to perform the essential functions of an executive's position . . . ." AR 951. Michael Howe, Allina's Chief Administrative Officer, expressed the same opinion and noted that Allina's "executive team encouraged [MacNally] to seek disability benefits in 2001 . . . ." AR 952.

Further, MacNally himself, in his letter of December 6, 2002, addressed some concerns that LINA staff had raised with him. AR 943-45. Specifically, in response to LINA's

suggestion that because he exercised he must not be disabled, MacNally explained that he exercised much less often and less intensely than he used to and that exercise was therapeutic for his MS. AR 944. MacNally also contested the notion that because he could still drive he could still work; he explained that he often could not drive, saying: "I no longer can guarantee when I go to bed at night that I will be able to drive come morning." AR 944. And MacNally said that he needed to rest every day in the late morning and take a nap every afternoon. *Id.*

In January 2003, Bernard wrote orders for home nursing visits to administer IV Solu-Medrol. AR 760-61. Although the record does not contain an office-visit note, this drug was administered in the past to MacNally only when he was experiencing an MS flare-up, and in a letter dated January 8, 2003 (the same date as the order for the nursing visit), MacNally's wife, Janet, said that he was experiencing an MS flare-up and receiving IV steroids. AR 927.

In that same letter, Janet described the effects of MS on her husband. She said that "fatigue has had the greatest impact" on MacNally's life. AR 925. She said that they stopped entertaining and going out because MacNally "needs to come home and rest (sleep) after work due to his exhaustion. Following a nap he would still not have the stamina to attend the theatre or entertain friends." *Id.* She also said that MacNally suffered significantly greater insomnia, pain, and fatigue after his beta-interferon injections. *Id.* And she said that MacNally had to rest for a half an hour every day at lunch and nap for at least thirty to forty-five minutes every afternoon. AR 926.

In March 2003, as noted above, LINA approved MacNally's claim for disability benefits, and the record therefore does not include medical records from the remainder of 2003 or from 2004. The next document reflecting MacNally's medical condition is an application for benefits completed by MacNally in June 2004 in response to LINA's notification that he was about to

enter the any-occupation period. AR 563-71. In that application, MacNally described in detail his symptoms of fatigue, numbness and tingling in his hands and feet, pain, insomnia, mood difficulties, and drop foot. AR 568. With respect to his energy levels, MacNally said, "I am never sure in the morning if I will have the energy to do what I plan to do for the day. One day I have the energy the next day I may not." *Id.* He also said, "I need to nap every day, I have to take breaks when I may not want to and I tire easily from stress or pressure. This makes holding a job difficult." *Id.* For exercise, MacNally walked in a pool three times a week. AR 564. He reported using a cane to walk and needing to sit on a chair when showering. AR 568.

In office-visit notes from January 2005, MacNally's new neurologist, Dr. Allan P. Ingenito, said that MacNally "continues to experience intermittent waxing and waning complaints including blurred vision, imbalance, paresthesias in his legs and arms, generalized fatigue and stiffness in his feet, particularly in the afternoon," but also said that MacNally "has been doing relatively well." AR 406. MacNally was still taking Provigil for his fatigue, which Ingenito described as "relatively effective . . . ." AR 408. Ingenito noted that a brain MRI from July 2004 showed "a few areas of increased T2 signal consistent with demyelination" — that is, with the disease process underlying MS.[36] AR 406.

In a visit in March 2005 to his new primary-care physician, Dr. Ryan Else, MacNally asked about less-expensive alternatives to Provigil. AR 377. Although MacNally was being seen for recurring numbness in his feet, Else described MacNally's MS as "stable." *Id.* Else

---

[36]"It is now generally accepted that MS involves an autoimmune process — an abnormal response of the body's immune system that is directed against the myelin (the fatty sheath that surrounds and insulates the nerve fibers) in the central nervous system (CNS — the brain, spinal cord and optic nerves)." Nat'l Multiple Sclerosis Soc'y, "What Causes MS?" http://www.nationalmssociety.org/about-multiple-sclerosis/what-causes-ms/index.aspx (last visited May 15, 2009).

also described MacNally's depression and insomnia as "[s]table on Effexor/trazodone."[37] AR 378.

Some time between March and June 2005, MacNally switched from Provigil to amantadine,[38] which provided some relief for his fatigue. AR 403. At an office visit with Ingenito in June 2005, MacNally reported increasing stiffness in his feet, slightly worse hand tremors, and some numbness after exercise and sitting on hard surfaces. *Id.* Ingenito described MacNally's MS as "stable on Rebif without recent exacerbation." AR 405. Ingenito recommended that MacNally continue to exercise and remain active. *Id.*

Ingenito also completed, on June 13, 2005, a portion of MacNally's supplemental claim form for disability benefits. AR 556. On the form, Ingenito indicated that MacNally had psychological limitations and was limited in every activity besides sitting — namely, in standing, walking, climbing, stooping, bending, lifting, and using his hands. *Id.* Ingenito listed MacNally's symptoms as paresthesias, gait abnormalities, cognitive deficits, lack of coordination, and fatigue, and checked a box indicating that MacNally's condition had "[r]etrogressed." *Id.*

Other aspects of the form are hard to interpret. In a section titled "Physical Impairment," Ingenito checked a box next to "Class 4 – Moderate limitation of functional capacity; capable of

---

[37]Effexor is a brand name of venlafaxine, a selective serotonin and norepinephrine reuptake inhibitor (SNRI). U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Venlafaxine," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html (last visited May 15, 2009).

[38]"Amantadine is used to treat Parkinson's disease and conditions similar to those of Parkinson's disease. . . . This medication is sometimes prescribed for other uses . . . ." U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Amantadine," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682064.html (last visited May 15, 2009). It is sold under the brand name Symmetrel. *Id.*

clerical/administrative (sedentary) activity (60–70%)."[39]  AR 558.  In a section titled

"Mental/Nervous Impairment," Ingenito checked a box next to "Class 3 – Patient is able to

engage in only limited stress situations and engage in only limited interpersonal relations

(moderate limitations)."  *Id.*  But in a section titled "Rehabilitation," Ingenito indicated that

MacNally could begin a trial of part-time employment at his own job in January 2007 — some

eighteen months hence.  *Id.*  Yet Ingenito also indicated that MacNally's job could not "be

modified to allow for handling with impairment[.]"  *Id.*  And Ingenito did not indicate that

MacNally could begin a trial of either full- or part-time employment at any *other* job.  *Id.*

Throughout July and August 2005, MacNally saw Else three times for primary

complaints not related directly to his MS (for instance, hypertension).  AR 372-76.  MacNally

reported in July 2005 that he was fatigued and felt that his thinking was slow, but Else described

MacNally's MS and depression as stable and noted that MacNally was sleeping normally.

AR 375-76.  In August, Else adjusted MacNally's medications in response to MacNally's

concerns about increasing tremors, anxiety, and depression.  AR 374-75.

MacNally saw Ingenito in mid-December 2005.  MacNally reported numbness and

tingling in his hands and right arm and unpleasant sensations in his feet.  AR 399.  MacNally

reported that he rested for two hours each afternoon and treated his fatigue effectively with

Provigil (if available) or amantadine, which was not quite as effective.  *Id.*  MacNally described

his blurred vision as stable, though it got worse with fatigue and heat.  *Id.*  Ingenito described

MacNally's MS as stable with "mild waxing and waning symptoms," AR 401, and a brain MRI

taken in mid-December 2005 showed "no abnormal enhancement suggestive of active plaque

---

[39]The form does not indicate what "60–70%" refers to.

formation." AR 398. Ingenito referred MacNally to a urologist for bladder-control problems. AR 401.

In January and March 2006, MacNally worked with his primary-care doctor to address sleep problems and occasional night-time bedwetting. AR 368-71. MacNally underwent a sleep study in January which showed that he suffered mild-to-moderate sleep apnea.[40] AR 369. In March, MacNally began trying a "continuous positive airway pressure" or "CPAP" mask,[41] and he continued to wear a CPAP mask at least through September 2006. AR 369, 358.

MacNally then saw Ingenito in mid-July 2006. MacNally reported having fallen twice in the preceding seven months and experiencing paresthesias in both of his upper arms. AR 391. Ingenito continued MacNally's medication regime, including amantadine for fatigue, and encouraged MacNally to restart an exercise program. AR 393-94.

In late July 2006, MacNally submitted additional forms to LINA with respect to his waiver-of-premium claim, as well as documents from his eye doctor and a PAA from Ingenito dated July 25, 2006. AR 540-45. On the PAA, Ingenito indicated that MacNally could, in an eight-hour work day, continuously sit; frequently use his hands to grasp and do fine manipulation; frequently lift or carry ten pounds or less; occasionally lift, carry, push, or pull up

---

[40]"Sleep apnea is a common disorder that can be serious. In sleep apnea, your breathing stops or gets very shallow. . . . When your sleep is interrupted throughout the night, you can be drowsy during the day. People with sleep apnea are at higher risk for car crashes, work-related accidents and other medical problems." U.S. Nat'l Library of Medicine & NIH, Medline Plus — Health Topics, "Sleep Apnea," http://www.nlm.nih.gov/medlineplus/sleepapnea.html (last visited May 15, 2009).

[41]"CPAP is a treatment that delivers slightly pressurized air during the breathing cycle. This makes breathing easier for persons with obstructive sleep apnea and other respiratory problems." U.S. Nat'l Library of Medicine & NIH, Medline Plus — Encyclopedia, "Nasal CPAP," http://www.nlm.nih.gov/medlineplus/ency/article/001916.htm (last visited May 15, 2009).

to twenty pounds; and occasionally stand, walk, or reach below his waist or at desk level. AR 544-45. Ingenito indicated that MacNally could never: reach overhead; lift or carry over twenty pounds; climb, balance, stoop, kneel, crouch, or crawl; work overtime or use foot controls; or be exposed to extreme heat or cold, wet conditions, vibration, or fumes.[42] *Id.* As noted above, this July 25, 2006 PAA was the central document on which LINA relied in denying MacNally's waiver-of-premium claim.

MacNally himself, on his July 31, 2006 claim form, said, "I suffer from fatigue, numbness in feet [and] hands. Cannot stand for any length of time." AR 530. He also reported taking a nap every afternoon and needing help buttoning his clothes. *Id.* He reported that he walked laps in a pool for exercise and continued to use a cane and a shower seat. *Id.*

MacNally saw Else in late September 2006 to follow up on his sleep difficulties. AR 358-63. Else noted that MacNally had "multiple complaints of fatigue that have been ongoing for sometime . . . ." *Id.* MacNally reported some cramping and stiffness in his lower legs as well as "progressive muscle fatigue as months pass. . . . Yesterday only able to change one light fixture in house — couldn't do more [due to] tremor and weakness. Also needs to rest at[]least 90 minutes/day." AR 359.

Else wrote to LINA in late October 2006 to support MacNally's claim for the waiver-of-premium benefit, saying:

-----

[42]Ingenito placed checkmarks for all these activities in the column labeled "Check if supported by objective findings." AR 544-45. If the PAA form were more sensibly designed, this column would be headed "Never" (the three preceding columns are "Continuously," "Frequently," and "Occasionally"), and Ingenito in fact explained in a subsequent letter that he placed check marks in this column to indicate both that MacNally could never do those activities, and that this conclusion was supported by objective findings. AR 180.

> Ultimately, Mr. MacNally is left clearly having good days with at best functional capacity substantially less than five years ago. There are many days that he is much worse.
>
> I do not do disability medical care; however, in my medical opinion I do not believe Mr. MacNally to be capable of sustaining any daily work of any support given his multiple sclerosis and it[s] associated depression, insomnia and fatigue.

AR 194.

Ingenito likewise wrote to LINA in late October 2006 to support MacNally's claim and to further explain both the form that Ingenito completed on June 13, 2005 and the PAA that he completed on July 25, 2006. AR 180-81. Ingenito wrote:

> [T]he limitations of Mr. M[a]cNally's medical condition as a result of his diagnosis of multiple sclerosis renders the ability to serve as the coordinator of rehabilitative services or healthcare facility administrator impossible.[43]
>
> Mr. M[a]cNally's fatigue prevents him from being able to perform *any occupational activities* on a consistent and regular basis. My description of the 'moderate control' of his symptoms is relative to his baseline disability, and even with this level of 'moderate control,' his activity level and resistance to fatigue remain significantly impaired compared to a normal individual.
>
> Mr. M[a]cNally is not able to perform any of the material and substantial duties of the occupations for which he is qualified on the basis of his education, training, and experience (hospital and healthcare administration). The stress of the job is contraindicated given Mr. M[a]cNally's fatigue, limited ability to stand and walk, and the requirement that he rest and/or take a nap on a daily basis.

*Id.* (emphasis added).

Fowler and Erickson also wrote letters to LINA about MacNally's disability around this time. In a letter dated November 7, 2006, Fowler opined

_____

[43]These are the two jobs that LINA, in its letter of September 8, 1996 denying MacNally's waiver-of-premium claim, told MacNally that he could do. AR 209.

It would be a gross error for [MacNally] to put pressure on his body in order to volunteer or work more. His body is following the course of progressive illnesses and is becoming less functional. . . .

It is not possible for him to return to the rigors of a daily work schedule. In my professional opinion, this would initiate a sequence of emotionally discouraging and even self-destructive dilemmas for his life.

AR 195. And Erickson summarized MacNally's visual problems this way:

Mr. MacNally has MS with mild optic atrophy in the right eye and moderate binocular instability, which leads to double vision in all directions of gaze away from the primary position. This double vision within 20° of the primary position constitutes a major permanent and non-fixable visual impairment. . . . It is my opinion that Mr. MacNally is unable to function in a job with his level of education, training, and experience on any regular or consistent basis.

AR 192-93.

A brain MRI conducted in early December 2006 did not show any significant changes since an MRI a year earlier. AR 389. MacNally saw Else a month later, in early January 2007, and reported that his depression (being treated with Effexor) and his insomnia (being treated with Ambien CR[44]) were both fairly well controlled. AR 355. Else noted that MacNally's gait was fairly normal (apart from his use of a cane) and his sensation was grossly intact. AR 356. MacNally did, however, report some worsening of paresthesias in his right hand and some double vision. AR 355.

MacNally then saw Ingenito in late January 2007. AR 130-33. MacNally reported worsening symptoms, including double vision, paresthesias, muscle cramping, and "imbalance

_____

[44]Ambien CR is the brand name of an extended-release formulation of zolpidem, a sedative-hypnotic used to treat insomnia. U.S. Nat'l Library of Medicine & NIH, Medline Plus Drug Information, "Zolpidem," http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last visited May 15, 2009).

and falls once per week, with no significant injuries." AR 130. MacNally also reported "significant fatigue, requiring naps approximately 2 times per day," and said that amantadine was no longer effective in treating his fatigue. *Id.* Because MacNally was in the process of looking for a new primary-care doctor, Ingenito and MacNally agreed to postpone changing his stimulant prescription. AR 132. With respect to MacNally's disability insurance, Ingenito noted, "we can consider repeating the neuropsych evaluation or obtaining a formal functional capacity evaluation to objectively document fatigue." *Id.*

In mid-February 2007, Ingenito wrote another letter to LINA about MacNally's status, this time responding directly to the opinion of LINA's in-house physician, Mendez, that MacNally was not disabled. AR 124-25. Ingenito wrote:

> I am unaware of any documentation from a qualified physician that has evaluated Mr. Mac[N]ally that he is able to work.
>
> Mr. Mac[N]ally's chronic fatigue is the primary issue regarding his inability to sustain full-time competitive employment. Mr. Mac[N]ally has always been an individual with respect to his symptomatology. Fatigue is a common and often debilitating problem seen in patients with multiple sclerosis. The limitation of fatigue is not measurable by manual muscle testing or strength testing.
>
> Dr. Mendez is listed as an occupational and internal medicine physician. He obviously lacks the necessary familiarity or training with the nature of fatigue and multiple sclerosis, as he suggests . . . quite incorrectly that physical testing would protect this. . . .
>
> The nature of multiple sclerosis is that of progressive dysfunction, and over time, it would be expected that Mr. Mac[N]ally's inability to work would increase rather than decrease.

AR 124.

In April 2007, MacNally underwent neuropsychological testing to assess his cognitive functioning. AR 283-85. The test results disclosed a "relatively mild" cognitive disorder "with indication of mild decline beyond normal aging effects in speed of processing and in aspects of learning and memory efficiency." AR 284. The assessor, a psychologist, said in conclusion that the identified cognitive deficits

> are not cognitive deficits[] which would be expected to interfere with capacity to carry out daily activities and responsibilities. The mild memory impairment and mild slowing of processing would be of greater potential relevance if subjected to the greater cognitive demands of a work setting commensurate with his educational and past occupational history. With MS, of course, ultimate employability and disability hinges on the broader constellation of symptomatology, including fatigue issues, those best addressed by a physician.

AR 285.

### 3. LINA's Medical and Vocational Assessments

In the course of its alternating denials and approvals of MacNally's various claims for benefits, LINA used its medical staff as well as outside consultants to assess the medical evidence. On the basis of those medical assessments, LINA also conducted vocational assessments. Some of those medical and vocational assessments have already been discussed. Below, the Court discusses in more detail those assessments, as well as other opinions of LINA's medical personnel in the administrative record.

When MacNally first applied for benefits, in July 2002, his records were reviewed by Kathi Coon, a registered nurse employed by LINA as a nurse case manager. LINA's notes show that Coon doubted MacNally's disability in part because he could still drive. AR 1092 (Coon "questions how [MacNally] 'ran to the store'"), 1040 (Coon "having a difficult time correlating

that [Dr. Bernard] is indicating that he cannot do anything, yet he continues to drive, and run errands").

In October 2002, Coon asked Bernard a series of questions reflecting Coon's assessment of the records. Coon asserted that "[t]here does not appear to be documented change in [MacNally's] condition from 2/12/02 to 7/3/02" and asked Bernard to comment. AR 1038. Coon also asserted that MacNally "appears to function quite well under the exercise program" and asked how this had changed. *Id.*

Before receiving Bernard's answers, Coon consulted Dr. John Mendez about MacNally's claim.[45] In a note dated October 25, 2002, Coon wrote, "Per Dr. Mendez medical is not supportive of [limitations and restrictions] from Dr. Bernard." AR 1036. The record contains no other documentation about this opinion from Mendez.

On October 30, 2002, Bernard responded to Coon's questions. AR 970. As noted above, Bernard said that MacNally's condition had changed because of increased fatigue and chronic insomnia. *Id.* Coon then consulted again with Mendez and asked him to review Bernard's letter. Coon's note to the file in early November 2002 summarizes Mendez's opinion as follows: "Provided documentation does not support the restrictions detailed in [Dr.] Bernard's 9/18/02 PAA, particularly given the fact that Mr. MacNally continued working until 7/3/02 despite reported MS flare-ups."[46] AR 969. The record contains no other documentation about this opinion from Mendez.

_____

[45]Although Mendez's credentials are not reflected in LINA's documents, it appears (based on the February 19, 2007 letter from Ingenito quoted above), that Mendez specializes in internal medicine and occupational health, not neurology. AR 124.

[46]Everyone who goes on disability leave necessarily works until some point before taking that leave. The fact that a person was working before he went on disability leave is not very good evidence that he was not disabled at the time he went on leave.

Around this time, Coon also consulted a LINA doctor or psychologist identified only as Dr. Fitzpatrick about the medical records from MacNally's psychologist, Fowler. According to Coon's notes, Fitzpatrick raised questions about a number of issues. First, Fitzpatrick asked when MacNally retired, given that "[r]etirement party documented in Jan[uary] 02 notes" but MacNally's last day of work was listed as July 3, 2002.[47] AR 974. Second, Fitzpatrick said that Fowler diagnosed MacNally with major depressive disorder "without medical documentation to support" the diagnosis. *Id.* Third, Fitzpatrick questioned why Fowler had not referred MacNally for "psychiatric evaluati[o]n for depression" despite a declining assessment of MacNally's functioning and the diagnosis of depression.[48] AR 975. And Fitzpatrick observed that MacNally was working "as late as" May and June of 2002 despite his depression and "was considering interviewing for a new job."[49] *Id.*

As noted above, LINA denied MacNally's claim for disability benefits in mid-November 2002 and MacNally appealed. In March 2003, after MacNally provided additional medical records and various letters in connection with his appeal, LINA sought the opinion of an outside neurologist, Dr. Kenneth B. Graulich. AR 656-61. After reviewing the records and speaking with Bernard by phone, Graulich concluded: "The medical documentation supports the patient's

---

[47]Fowler's notes from the period of January to February 2002 say that "Gordon Springer retired" and that MacNally's "friend, Gordon Springer's retirement party was very emotional for" MacNally. AR 1008-09. Fitzpatrick apparently did not read Fowler's notes very carefully.

[48]One obvious explanation comes to mind: Fowler, a psychologist, was providing psychotherapy for MacNally's depression, and MacNally's primary-care doctor was managing the pharmacological side of the depression by prescribing antidepressants.

[49]This seems to refer to Fowler's notes from the period of May to June 2002, in which Fowler said that MacNally interviewed for a job at a hospital in Wisconsin. AR 1013. But Fowler also noted, right after mentioning the interview, that MacNally was "very down about the energy he knows the job would require that he doesn't have." *Id.* Fitzpatrick seems to have ignored or discounted the latter observation.

inability to work in a high profile position such as hospital administrator from 7/3/02 to the present." AR 660. Graulich also found, however, that MacNally could do "sedentary work in general," a finding that Graulich said followed from Bernard's September 18, 2002 PAA. *Id.* With respect to MacNally's fatigue, Graulich said that it was "not a 'provable' symptom but one which significantly affects the majority of patients with MS . . . ." *Id.*

LINA's next medical review of MacNally's records came in September 2006, in connection with the waiver-of-premium claim. A LINA case manager, Louise Cronin, asked a registered nurse at LINA, Kay Rhodes, whether the medical records "support functionality provided by" the July 25, 2006 PAA completed by Ingenito. AR 218. Rhodes wrote that Ingenito "does not provide [office visit notes] but does provide a level of functionality which is consistent with [claimant's] reported [activities of daily living] including extensive typewritten documentation." AR 219. Rhodes's comment about "extensive typewritten documentation" appears to refer to MacNally's appeal letters and exhibits.

As discussed above, LINA then used Ingenito's July 25, 2006 PAA as the basis for a TSA that identified two jobs MacNally ostensibly could do, including his former job. AR 211-12. Next, LINA told MacNally in early September 2006 that his claim for the waiver-of-premium benefit was denied. AR 205, 207-10. In mid-September, LINA received additional records from Ingenito dating from January 2005 through July 2006. AR 202. Rhodes reviewed the records and concluded: "The additional medical does not provide [an] increase in deficits that would indicate a change in the [claimant's] condition that would significantly impact his function from previous PAA dated 7/25/06 from neurologist that provided a level of functionality." AR 200.

MacNally provided various additional documentation over the next few months. On December 6, 2006, LINA asked a registered nurse, Jane Young, to review medical records from Erickson, MacNally's eye doctor. Young wrote: "New medical submitted from op[hthalmologist] is only new medical. It does indicate some visual impairment[,] enough for 24% tot[al] impairment. This impairment is insufficient to support a [decreased] functionality for any type of activity." AR 157.

LINA also asked Mendez for another opinion, which he gave on December 18, 2006. After his review of the letters prepared in October and November 2006 by MacNally's doctors, Mendez concluded:

> Based on the additional provided records, the original assessment regarding [waiver of premium] remains unchanged. This is because, although multiple subjective complaints are noted, predominantly fatigue, inability to work in stressful situations and insomnia, there is no documentation of significant measured physical limitations, such as strength deficits measured by manual muscle testing, and no documentation of cognitive and/or psychological limitations, such as could be obtained by a mini-mental status examination/MMSE and/or, more comprehensively, by neuropsychological testing.

AR 448.[50]

As noted above, Ingenito wrote to LINA in February 2007 and directly criticized both Mendez's qualifications and his conclusions. AR 124-25. There is no evidence that anyone at LINA with medical training considered Ingenito's letter.

Instead, the only additional medical review conducted by LINA after December 2006 related to the neuropsychological test conducted by a psychologist, Steven F. Morgan on April 6, 2007. As noted above, Morgan concluded that MacNally's cognitive deficits "would [not] be

---

[50]The phrase "significant measured physical limitations" does not appear in MacNally's life-insurance policy.

expected to interfere with capacity to carry out daily activities and responsibilities." AR 285.

LINA forwarded Morgan's report to an outside psychologist, Daniel Benincasa, for review, and

Benincasa found that Morgan's conclusions were reasonable. AR 106-08. Specifically,

Benincasa opined that MacNally had "work capacity in the any occupation scenario" even

though he could no longer do his former job.[51] AR 107. In addition, a LINA employee named

Lance Gardner, a licensed professional counselor with some type of master's degree, also

reviewed the test results and concluded that the report was "not supportive of a

neuropsychological basis for cognitive deficits which would preclude activities of daily living

including work capacities." AR 271. It is important to note, however, that Morgan's report

addressed MacNally's cognitive abilities in isolation, and Morgan expressly deferred the

question of MacNally's "ultimate employability" to a physician. AR 285.

LINA then commissioned a TSA based, ostensibly, on Benincasa's report and on the

July 31, 2006 disability questionnaire prepared by MacNally. AR 239-41. It appears that the

disability questionnaire was used for MacNally's work and education history and to limit the

universe of jobs to those in the "sedentary" category. The TSA identified five sedentary

positions that MacNally could do with his cognitive limitations: customer-service

representative, interviewer, patient-services representative, registration clerk, and admissions

clerk. AR 240. The TSA does not indicate whether these jobs permit the daily afternoon naps

that MacNally, on the July 31, 2006 questionnaire, described himself as requiring.

_____

[51]Despite the unqualified nature of this assertion, Benincasa had no basis to assess
MacNally's overall ability to work. Benincasa, a psychologist, evaluated only a single report
about neuropsychological testing.

## II. ANALYSIS

### A. Standard of Review

MacNally challenges LINA's decision, as an ERISA plan administrator, to deny his

claim for the waiver-of-premium benefit. The parties cross-move for summary judgment.

Accordingly, two interlocking standards of review apply in this case: the general summary-

judgment standard and the specific standard that applies to judicial review of decisions by

ERISA plan administrators.[52]

---

[52]The Sixth Circuit has held that ERISA cases are not really amenable to summary judgment. In *Wilkins v. Baptist Healthcare Systems, Inc.,* Judge Gilman, writing for the panel on this point, said:

> There appears to be great confusion among the district courts as to the proper method of adjudicating proceedings brought under 29 U.S.C. § 1132(a)(1)(B) ("ERISA actions"). Some district courts conduct a bench trial on the merits of an ERISA action under Fed. R. Civ. P. 52, while others utilize the summary judgment procedures set forth in Fed. R. Civ. P. 56. We believe that both approaches are inconsistent with the appropriate standard of review set forth by this court in *Perry v. Simplicity Engineering*, 900 F.2d 963 (6th Cir. 1990) . . . .

> This standard of review does not neatly fit under either Rule 52 or Rule 56, but is a specially fashioned rule designed to carry out Congress's intent under ERISA.

150 F.3d 609, 618-19 (6th Cir. 1998) (Gilman, J., joined by Ryan, J., concurring); *see also Burch v. Hartford Life & Accident Ins. Co.*, 383 F. Supp. 2d 1119, 1124 (W.D. Ark. 2005) ("[ERISA] cases are not to be determined under the standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56(c). *See Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The court must decide whether benefits were properly denied based on a review of the record presented to the administrator under the appropriate standard.").

In this case, the parties denominate their motions as ones for summary judgment, and both parties ask the Court to decide the matter based on the administrative record. Because nothing turns on how the motions are characterized, the Court follows the parties' lead and describes their motions as ones for summary judgment.

### 1.  Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party."  *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### 2.  ERISA

In many ERISA cases, the ERISA plan authorizes the plan administrator to determine eligibility for benefits, and courts therefore review the administrator's determinations for abuse of discretion.  *See Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 837 (8th Cir. 2006).  But in this case, LINA has conceded that its decision is subject to de novo review.  Letter from Scott R. Carlson, Sept. 24, 2008 [Docket No. 49].  Accordingly, the Court must determine, without any deference to LINA, whether MacNally is entitled to the waiver-of-premium benefit.  *See Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993).

MacNally argues that in addition to reviewing his claim de novo, the Court must place the burden of proof on LINA, because LINA terminated MacNally's waiver-of-premium benefit after having first approved it.  Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 11-13 [Docket

No. 67].  The Court does not reach this argument because it finds that, even if MacNally were assigned the burden of proof, he would be able to meet it, as MacNally has established by a preponderance of the evidence that he is disabled under the life-insurance policy and thus is entitled to the waiver-of-premium benefit.

## *B.  Benefit Claim*

LINA concluded in its June 2007 TSA that MacNally could do five sedentary jobs. AR 239-41.  This TSA was cited in LINA's letter denying MacNally's waiver-of-premium claim as the basis for LINA's conclusion that MacNally was not disabled under the any-occupation definition of disability found in the life-insurance policy.  AR 96.  In this litigation, LINA asks the Court also to consider the September 2006 TSA that identified two jobs MacNally could ostensibly do, including his former job as a health-care-facility administrator.  Def Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 4-7, 8 [Docket No. 63].  According to LINA, these two TSAs demonstrate that MacNally is capable of working at some occupation.

MacNally challenges LINA's conclusion about his ability to work on two grounds.  First, he contends that he is not, in fact, capable of working at any occupation, including any of the occupations identified in the TSAs.  Pl. SJ Opp. at 8-11, 18-20, 23-28.  Second, he contends that his life-insurance policy includes an implicit wage threshold, and the jobs identified by LINA do not meet that wage threshold.  *Id.* at 14-18; Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 23-27 [Docket No. 54].  The Court is skeptical of MacNally's wage-threshold argument, but the Court does not reach this argument because the Court finds that MacNally has established that he "is unable to perform the material and substantial duties of any occupation for which he . . . is, or may reasonably become, qualified . . . based on education, training and experience."  AR 57.

There is no dispute that MacNally suffers from relapsing-remitting MS, a progressive

neurological disorder.  It is also clear that MacNally has received high-quality medical care and,

for many years, suffered relatively mild symptoms.

MacNally's condition has deteriorated over time, as would be expected, given that he

suffers from a progressive disorder.  Despite this deterioration, however, MacNally resisted

seeking disability benefits.  Indeed, although his doctors and coworkers began urging him to file

for disability benefits as early as 2000, MacNally did not do so until mid-2002, after his health

worsened and management at Allina pressured him to stop working.  The record demonstrates

that MacNally is the opposite of a malingerer.  He repeatedly expressed to his doctors his desire

to work, his depression at being unable to work as much or as well as he would like, and his

determination to work as long as possible.  And, as noted, far from embracing disability as a

means of early retirement, MacNally resisted filing for disability benefits until coming under

considerable pressure to do so.

That said, the record does not demonstrate that, as of 2002, MacNally was unable to do

*any* occupation for which he was suited.  In particular, because in 2002 and 2003 MacNally was

focused on establishing that he met the own-occupation definition of disability under the long-

term disability policy, much of MacNally's evidence from this period addressed his ability to

work in a stressful position as a high-level executive.  *See, e.g.*, AR 946 (Bernard's

November 25, 2002 letter stating that "[t]he job requirement of 60 to 70 hours per week would

not be possible for an individual with Mr. M[a]cNally's disabilities").  The evidence does not

exclude the possibility that, in 2002, MacNally could have worked at some less-demanding

position for which he was nevertheless professionally suited.  The evidence does not exclude this

possibility simply because MacNally and LINA were not focused on this issue.

Whether MacNally could have worked in 2002 is largely irrelevant, however, because LINA cut off MacNally's waiver-of-premium benefit in September 2006, and thus it is MacNally's condition in 2006 that matters for purposes of this litigation. The evidence establishes that, by 2006, MacNally was no longer capable of working at any occupation. There is no evidence that MacNally's doctors ever exaggerated his problems or were anything other than candid with LINA. Every one of those doctors agreed that, by 2006, MacNally's combination of symptoms — and particularly his overwhelming fatigue — foreclosed the possibility of employment. *See* AR 180-81 (Ingenito letter), 194 (Else letter), 195 (Fowler letter); *see also* AR 192-93 (Erickson letter about visual impairment). This is hardly surprising. Fatigue is perhaps the most debilitating symptom of MS, and the medical records show that fatigue was a constant and increasingly troublesome problem for MacNally. He took stimulants regularly since some time in 2000 or 2001, and he reported needing increasingly long daily naps and rest periods since September 2002.

MacNally was rendered unable to work not only by the *severity* of his fatigue, but by its *unpredictability*. MacNally reported that, when he would go to bed at night, he would never know how much energy he would have the following day. Some days he would wake up so fatigued that he could not even drive. Nothing in the record contradicts MacNally's description of the unpredictability of his fatigue. LINA has not explained how someone who does not know, from day to day, whether he will even have enough energy to drive could successfully hold down any of the five jobs identified by LINA in its June 2007 TSA.

Further, the Social Security Administration ("SSA") determined that MacNally was disabled under its definition of disability as of September 2003. AR 580. Even though the SSA's decision is not in the record, and even though the SSA's definition of disability differs

from the definition applicable to MacNally's waiver-of-premium claim, the fact of this decision is evidence in favor of MacNally's claim.

Given that the weight of the evidence establishes that MacNally has met the any-occupation definition of disability since September 2006, and given that the Court is reviewing MacNally's claim de novo, there is no particular need for the Court to explain in detail where LINA went wrong in its evaluation of MacNally's claim. Nonetheless, because LINA's handling of MacNally's claims seems to reveal either bias or incompetence on LINA's part, the Court believes that some discussion of LINA's flawed decision making is warranted.

In particular, LINA had no business denying MacNally's waiver-of-premium claim on the basis of Mendez's opinion in December 2006 that MacNally could work despite his "multiple subjective complaints . . . , predominantly fatigue, inability to work in stressful situations and insomnia" because there was "no documentation of significant measured physical limitations" in MacNally's medical records. AR 448. An insurance policy certainly *could* require that a disability claim be supported by "documentation of significant measured physical limitations," but MacNally's life-insurance policy does not do so. And while fatigue may be subjective, that does not make it feigned. Further, fatigue is a common, potentially debilitating symptom of MS — a point even Graulich, LINA's consulting neurologist, acknowledged. AR 660. Finally, Mendez does not appear to be a neurologist, and LINA therefore had little reason to disregard the opinions of MacNally's treating neurologist in favor of Mendez's opinion.

LINA's bias is apparent from other evidence as well, some of which the Court has already pointed out. Most notably, LINA treated Ingenito's July 25, 2006 PAA like a lottery ticket. It relied on it not only to deny MacNally's waiver-of-premium claim, but also to reopen

LINA's consideration of MacNally's long-term disability claim. And LINA focused on the PAA in isolation, disregarding Ingenito's subsequent explanations of it. In particular, there is no evidence that LINA's medical staff ever considered Ingenito's letter of February 19, 2007, in which Ingenito challenged Mendez's assessment that MacNally was capable of working. Instead, LINA asked Benincasa in May 2007 to review, in isolation, a report of neuropsychological testing that deliberately deferred questions about MacNally's "ultimate employability and disability" to a physician. AR 116, 106.

In short, LINA unjustifiably disregarded substantial medical evidence that MacNally's MS-related fatigue was disabling. And rather than fairly reviewing the evidence as a whole, LINA consistently looked for isolated pieces of evidence (such as MacNally's ability to drive and to exercise, and the fact that MacNally — with difficulties ignored by LINA — cared for his wife) that could be taken out of context or distorted to support LINA's goal of denying MacNally's claims.

### C. Attorney's Fees

MacNally seeks an award of attorney's fees. Whether to make such an award is within a district court's discretion. *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1329 (8th Cir. 1995). The Eighth Circuit has identified five factors that courts should consider in deciding whether to award attorney's fees in an ERISA case:

> (1) the degree of culpability or bad faith which can be assigned to the opposing party, (2) its ability to pay, (3) the potential for deterring others in similar circumstances, (4) whether the moving party sought to benefit all plan participants or beneficiaries or to resolve a significant legal question regarding ERISA, and (5) the relative merits of the parties' positions.

*Id.*

The Court finds that, on balance, these factors favor MacNally, and the Court therefore directs LINA to pay his attorney's fees. In this case, as in another case recently before this Court,[53] LINA did not behave toward MacNally as a fiduciary acting in his interests and the interests of plan participants. Rather, LINA acted like a company whose goal was to deny MacNally's claim. Instead of considering the evidence fairly and as a whole — instead of being driven by a sincere desire to discover the truth about MacNally's condition — LINA instead hunted through the record and grabbed on to any isolated bit of evidence that might support a decision to deny benefits. LINA acted as MacNally's adversary, not as his fiduciary, and thus MacNally is entitled to recover his attorney's fees.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    LINA's motion for summary judgment [Docket No. 61] is DENIED.

2.    MacNally's motion for summary judgment [Docket No. 52] is GRANTED as follows:

      a.    The Court DECLARES that MacNally has been entitled to the waiver-of-premium benefit under his life-insurance policy continuously since LINA discontinued that benefit by a letter dated September 8, 2006.

---

[53]*See Gordon v. Northwest Airlines, Inc. Long-Term Disability Income Plan*, No. 07-CV-4172 (PJS/RLE), 2009 WL 749828, at *23 (D. Minn. Mar. 18, 2009) ("LINA's behavior toward Gordon in this case was not that of a fiduciary acting in his interests and the interests of plan participants. Rather, LINA acted like a company that first decided to deny Gordon's claim and then went looking for evidence to justify that decision.").

b.    LINA is ORDERED to reinstate MacNally's coverage under his life-insurance policy in accordance with the terms of that policy.

c.    LINA is ORDERED to provide MacNally the waiver-of-premium benefit going forward, unless a termination of benefits is consistent with the life-insurance policy as interpreted by this Order and justified either by a change in MacNally's condition or by new information about MacNally's condition.

d.    LINA must pay attorney's fees and costs in an amount to be determined.

    i.    No later than thirty days from the date of this order, MacNally must serve and file an affidavit documenting the attorney's fees and costs he seeks to recover.

    ii.    No later than fifteen days after MacNally serves and files the above-referenced affidavit, LINA may serve and file a response of no more than 4,000 words.


Dated:  May 26, 2009                     s/Patrick J. Schiltz
                                                 Patrick J. Schiltz
                                                 United States District Judge